ADRIAN ISELIN, Respondent, *v.* JOHN H. STARIN, Appellant.

*Ancient road, claimed to be private — dedication and acceptance thereof — public user of the road for access to a ferry to an island — right of the occupants of the island to use the road.*

In an action in equity, brought by the owner of Neptune Island in Long Island Sound, connected with the mainland by a causeway, to enjoin the owner of Glen Island from using a road leading from the Pelham highway in Westchester county through Neptune Island to a ferry running to Glen Island, on the ground that the road was a private road, it appeared that the road had been opened to the public in 1836 by the then owner of Neptune Island, followed by user for public business, confirmed by certain subsequent owners, under such circumstances as indicate a right to the permanent use thereof by anybody who had occasion to use it, followed by a grant from the State of land under water for the erection of a dock at the end of the road, upon a petition stating that the dock was required for the use and convenience of the public; it further appeared that there had been a formal acceptance of the road by the highway authorities.

*Held,* that the facts made out a dedication to public use for road purposes (per PRATT, J.);

That the failure of the plaintiff and his grantors, during such a length of time, to do any significant act opposed to such dedication, estopped them from maintaining an action in equity to enjoin the use of the road; and that the road should be deemed a public highway not only by long use, but by actual dedication and user.

It further appeared that for over forty years there had been a ferry, by means of which the occupants of Glen Island had been carried to the mainland by way of Neptune Island, there being a float maintained by the occupants of Glen Island at the termination of the ferry on Neptune Island, the means of access to which, from the Pelham highway, was over the old road in suit.

*Held,* that as to the question presented, it was of no importance whether the way was public or private; and that if the occupants of Glen Island owned a ferry right, with a float on Neptune Island, and a right of free passage to and from the Pelham highway, they should not be prevented by injunction from using it (per BARNARD, P. J.).

APPEAL by the defendant, John H. Starin, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of Westchester county on the 18th day of January, 1893, upon a decision of the court, rendered after a trial by the court, at the Westchester Special Term.

The action was brought to obtain a permanent injunction against the defendant which should restrain him from the use of a dock on

Neptune Island, in Long Island Sound, as a place for landing passengers from Glen (Starin) Island, and from using Neptune Island and the roadway leading therefrom to the Pelham road, on the mainland, as a public highway for passengers to and from Glen (Starin) Island.

*C. H. Roosevelt, W. W. Goodrich, Peter Cantine* and *Cornelius E. Kene,* for the appellant.

*Martin J. Keogh* and *Calvin Frost,* for the respondent.

PRATT, J.:

This controversy relates to a road leading from the old main highway which runs from Pelham to New Rochelle, in Westchester, to a ferry at tide water on a creek formed by the waters of Long Island Sound, as they ebb and flow, opposite Glen Island. It is the approach for the public by land to the present Glen Island ferry. Plaintiff claims that it is a private road, and has obstructed it. Defendant contends that it is a public road, and, by way of equitable counterclaim, asks that the obstructions be removed.

The defendant's Glen Island was formerly known as Locust Island. The plaintiff's main property is also an island, now known as Neptune Island, formerly called Moses Island. It was originally separated from the mainland by a small creek across which a stone causeway was built, so that street cars and wagons now run to, or substantially to, the defendant's ferry.

The testimony shows that this Moses or Neptune Island was owned by William Turpin in 1833, who conveyed the same to Catherine Wyman, who then owned the adjacent mainland. This Neptune Island and the mainland then passed to Jacob Rhinelander, through Catherine Wyman's will and deeds by her executors, in 1836; this deed conveys the road and causeway in question. The island then passed under Rhinelander's will, to the Underhills, in 1837, who conveyed the same, with the road and causeway, to Philip Underhill, in 1850, and the mainland was conveyed to other parties. Philip Underhill then conveyed the island, road and causeway, to Isaac Underhill, in 1859. Thorne and wife also gave Isaac Underhill a conveyance affecting some part of these premises in 1874, and in the same year Isaac Underhill conveyed the same to

Higgins, who mortgaged to Guion. The mortgage was assigned to Philip R. Underhill, and was subsequently foreclosed, and the premises were purchased by this Mr. Underhill in 1880, who meantime received other conveyances from Mr. Higgins. He, in 1882, conveyed the premises to Fredericks, who conveyed back to Hannah Higgins in the same year, and she conveyed to plaintiff in 1885. Each of these conveyances assumes to convey the road and causeway in question.

The defendant's title to Glen Island comes from Davenport, who conveyed to Depau in 1847, nothing being said about any landing or road. Depau conveyed to Livingston in 1848, and he conveyed to Godwin in 1854. These Depaus seem to have conveyed to Foulke in 1855, and Godwin conveyed to Foulke on the same day. Foulke then conveyed to Schmidt in 1862. This deed assumes to convey a right of way over the road in question from the old Pelham road to a steamboat landing to be presently mentioned, and the use of the ferry dock as used by the Foulkes, together with the right to land thereon, and the right of ferriage and docking. Schmidt died, and his executors in May, 1879, conveyed to defendant, granting like subject-matter.

It thus appears that Foulke owned the Glen Island, and Isaac Underhill, or his estate, owned the Neptune Island and the road, from about 1858 or 1859, at least, until after 1861. During this interval, Foulke used this dock for ferry purposes to Glen Island as a landing, having a regular ferry propelled by horse power. Foulke and Isaac Underhill contributed to the expenses of keeping this road in repair. Foulke paid him twenty-five dollars January 26, 1858, as " his proportion of the expenses or repairs of the causeway and roads." This fact is attested by Underhill's receipt, which defendant produced. A like receipt signed by Philip R. Underhill for I. Underhill's estate, attests the fact that Foulke, January 11, 1861, paid him fifty dollars for " his proportion of expenses repairing causeway and bridges for two years to January 1, 1861, on Neptune House Island." In 1868, Schmidt, and other owners on Glen Island, paid Philip R. Underhill seventy-five dollars, " being in full to January 1, 1868, for their contributions of twenty-five dollars each towards working of the road leading to the steamboat pier on the Neptune House Island for the estate of I. Underhill, deceased."

It seems that Isaac Underhill built the Neptune House on his island, and enlarged the former steamboat dock which stood at the water end of the road. He also had an interest in a steamboat which landed thereat. The precise circumstances under which these payments for road expenses were made, do not appear; but it is plain that the owners of the Glen Island and Neptune Island together, kept this road in repair, and it is quite obvious that they used it and this dock in common, the former for ferry purposes and the latter for steamboat purposes, and as an approach to his Neptune Island property.

There is no intimation that the payments were made as for licenses; on the contrary, they are said to be "proportion of expenses" in the earlier receipt, and "contributions" in the last one. I think it fair to assume, in the absence of any conveyance of a right of way over this road, and the absence, also, of any satisfactory explanation, that there was an understanding between these people that they should use this road in common as an approach to this dock. The road was open for the use of the Underhills' Neptune House guests, and was evidently used by Foulke and Schmidt as means of approach by the dock to the Glen Island property. So, too, it must have been used by the public as an approach to the Underhill steamboat which landed at the dock, and the patrons of Foulke's ferry.

Perhaps these facts do not necessarily show an unlimited offer of this road to the public as a highway. On the other hand, the evidence shows that when Depau owned Glen Island, he and Underhill had some bitter controversy about the location of the dock, in which Underhill had his way about it.

I think, however, that these facts do show that the Glen Island owners, certainly in Depau's time, had a right of way at the Underhill dock, and over this road up to the old Pelham road, and the fact is that Depau's deeds say nothing respecting this right of way. It is certain that the Foulke and Schmidt deeds do assert such a right.

Under these circumstances, especially in view of Foulke's ferry business, I think this case plainly shows an open user of both the dock and road by the Glen Island owners from 1858 on, under a claim of right, with the knowledge and consent of the Neptune Island owners; and since Foulke's deed to Schmidt in 1862, such

user was certainly under claim of right and color of title which could be conveyed.

We now come to consider another fact of great importance in this controversy. In 1845 Isaac Underhill and his wife, and Philip R. Underhill filed their petition with the Commissioners of the Land Office of this State praying for a grant of land under water for the purposes of enabling them to extend this steamboat dock, and asking to establish a dock thereon, with leave to collect wharf-age, etc. They therein state that the dock was built by, or, at least, in Catherine Wyman's time, "for the convenience of naviga-tion, and for the accommodation of steamboats and other crafts passing into the bay." There is no intimation that this use was in any way restricted. This must have been prior to 1836, for she died before that time, and her executors, during that year, conveyed to Rhinelander.

This petition also states that Rhinelander believed that she had obtained title to the land under water where the dock stood, but that it was subsequently discovered that she had not obtained such title. It also states that this dock or landing is "a great *public* convenience and *necessary* for the purposes of commerce, and will greatly increase those objects by extending the dock a little farther into the bay as designated" on a map filed. This map shows the road in question.

The petition also states that the contemplated extension of the dock " will be of great public convenience in a commercial point of view," and the object of the acquirement of the land was to increase that *public* convenience by extending it to deeper water so that larger vessels may moor thereat.

The petition also states " that, to render a landing place con-venient at the place now spoken of, and *that the public and others may pass from the main island either on foot or with carriages * * * to the contemplated dock ;* and that for *such purpose* it will be necessary to build of stone * * * abutment or bridge," etc.

It thus appears that this road was opened for these purposes by Catherine Wyman prior to 1836 as a means of reaching this dock, long before the Neptune House was erected ; and that it had reference to public travel between the old Pelham road and this dock for the purposes of commerce, as a means of enabling the public for business

purposes to come to this dock both by land and water, and that there was a business ferry at the dock.

The people of the State granted their patent on this petition. The patent expressly recites that it is for the purpose of promoting the commerce of our State, *and for no other object*, and the grant was made subject to reservations and conditions expressed; one of which was that if the patentees should not " within three years from that date (April 17, 1845), *actually appropriate and apply* the above-described premises to the purposes of a dock or docks thereon " the grant should be void. There is no pretense that the patentees failed to perform the condition, and they and their grantees now claim the land thus obtained because they thus appropriated that property to that public use.

Under these circumstances, I do not see how it can be doubted that the object of the dock and road was to enable anybody who chose to use it to come and go on the dock, and to use the dock itself for all purposes of a dock. Very likely the commerce between the mainland and Glen Island may not have been in Catherine Wyman's mind, or in the minds of the Underhills to the *extent* which we now see the development of that island, and the business there carried on, but we cannot doubt that that business is within the development of the general object and purpose for which the road was opened and the dock built, and within the purposes of the grant.

I do not now mean to say that this necessarily renders the dock a free, public dock, or the road necessarily a public highway. But, under these circumstances, I cannot doubt that the subsequent transactions between Glen Island, Foulke and Schmidt and the Underhills, indicate that the former were then acting in view of existing and conceded rights, to use the road as a means of approach to their property, and their business ferry. It thus seems plain to my mind that there was at least an acknowledged private right of way for Foulke and Schmidt and their grantees, and any lawful business to which they chose to devote their property. Hence, it seems to me, that the plaintiff, being one of Underhill's grantees, has no right, certainly no standing in a court of equity, to such aid in obstructing this road as a means of preventing the grantees of the Glen Island to reach their property or to carry on their ferry business. If that

be true of the grantees themselves, it must also be true of their patrons.

Plaintiff and his grantors have slept too long upon their claims to expect any aid of a court of equity. Their *laches* alone seems to me to weigh heavily against their contention on the merits.

Perhaps this conclusion will dispose of the case adversely to the plaintiff and in favor of the defendant. But, since other phases of it are before us, I may not unwisely go farther.

The fact is distinctly stated in this old petition to the Land Commissioners that one of the objects of this dock was its *public* convenience; and it is plainly intimated, if not alleged, that the object of the proposed extension of the dock, and of obtaining the land grant for that purpose, in part, at least, is to invite " the public to pass on foot or in carriages " over this stone road, which was so necessary. Under these circumstances, while it is possible that the Underhills may all the while have had some dim idea of retaining this road as their private right of way, it seems to me wholly improbable that they did such a thing. The plain fact was that the more the public used it the better for them and their purposed business scheme. They thus, by their recorded act and their subsequent conduct, clearly evinced their invitation to the public to use the road freely, and their erection of the hotel only emphasized this desire to profit by this public use of the road.

Here, then, was an offer of this road to the public which dates back to 1836, and there can be no doubt, upon this evidence, that the public did use it without interruption, unless by the gate, to be presently noticed.

We thus find an offer of this road to the public — an offer made by Catherine Wyman in 1836, followed by user for public business purposes, confirmed by the Underhills under such circumstances as to indicate the right to the permanent use thereof by anybody who had occasion to use it, followed by a grant from the State which necessarily involved anybody and everybody's right freely to come and go over it. I think they were thus estopped from withdrawing that offer. We think this seems to make out dedication so far as one may dedicate his land to public use for road purposes. This was followed by the formal acceptance of this road by the highway authorities of New Rochelle village. A street railroad has since

been laid and has been for years used upon it, and all the while plaintiff and his grantors have done no significant act. To come now into a court of equity seeking equitable relief seems to me unwarranted.

I am, therefore, unable to see why this road should not be held a public highway, not only by this long use, but by actual dedication and acceptance. Under these circumstances, I regard the testimony about the gate as of very little importance. That testimony was very unsatisfactory at best, and it, in no way, shakes my confidence in the conclusions already stated. The same is true of the notices and declarations of the Underhills about their supposed rights.

These views lead to a reversal of this judgment and to the conclusion that plaintiff is wrong in obstructing this road.

Judgment must be entered for the defendant, with costs.

BARNARD, P. J.:

For over forty years there has been a ferry by means of which the occupants of Locust Island, now Glen Island, have been carried to the mainland over Neptune Island. During all that time there has been a float maintained by the occupants of Glen Island on Neptune Island, the termination of the ferry. The means of access from the Neptune Island float has been over an old way which passed over Neptune Island and over a causeway to the Pelham road, a public highway. This old road was improved by the occupants of Neptune Island so as to provide better means of approach to a dock on Neptune Island at which steamboats landed for general carriage of passengers to and from Neptune Island, upon which there was a hotel; but the way existed long before this causeway was built. There is much doubt whether the part of the way from the Pelham road to the docks on Neptune Island were public highways; but there can be none but that the Glen Island occupants and all who came to it and went from it, passed as a matter of right over this way. As to the question presented it is a matter of no importance whether the way is public or private. If Glen Island owns a ferry right, with a float on Neptune Island, and a right of free passage from this float to and from the Pelham road, they should not be prevented by injunction from using it. The

right of approach, if it exists, would not be destroyed by the increased number of passengers which now pass over the ferry. The use acquired by prescription was for all who wished to go to Glen Island, and the right is not destroyed because the number of passengers is increased by the creation of a place of resort for people in summer to visit for purpose of pleasure and recreation.

I, therefore, concur in the result arrived at by Judge PRATT.

DYKMAN, J., not sitting.

Judgment reversed and new trial granted, costs to abide event.